UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

SHEENA SLIPPI-MENSAH,

        Plaintiff,

    v.

TROOPER J.M. MILLS #7412 and
TROOPER II A.M. SPARACIO
#6821,

        Defendants.

1:15-cv-07750-NLH-JS

**OPINION**

---

**APPEARANCES**:

JOHN B. KEARNEY
KEARNEY & ASSOCIATES, P.C.
210 WHITE HORSE PIKE
HADDON HEIGHTS, NJ 08035

    *On behalf of Plaintiff*

SUZANNE MARIE DAVIES
STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL
25 MARKET STREET
P.O. BOX 112
TRENTON, NJ 08625

    *On behalf of Defendants*

**HILLMAN**, District Judge

    This case concerns allegations of a traffic stop and arrest without probable cause and racial profiling by two New Jersey state troopers.  Presently before the Court is the second motion

of Defendants for summary judgment in their favor.  For the reasons expressed below, Defendants' motion will be granted.

<u>**BACKGROUND**</u>

On May 24, 2014, at about 3:30 a.m., Plaintiff, Sheena Slippi-Mensah, was driving in the Bellmawr, New Jersey area on I-76 and I-295.  Plaintiff had been at a friend's house and was on her way home to her mother's home in Deptford, New Jersey.[1] According to the dash-cam video, body microphone audio, and police reports, Defendants, Trooper J.M. Mills #7412 and Trooper II A. M. Sparacio #6821 of the New Jersey State police, observed Plaintiff failing to maintain a lane, speeding through a construction zone, and travelling 82 mph in a 45 mph zone for several minutes.  The patrol car's lights were activated, and Plaintiff pulled over.[2]

After reviewing Plaintiff's license and registration, Defendants asked Plaintiff to get out of the vehicle to perform a field sobriety test because Mills smelled alcohol in the car. Plaintiff and Defendants walked to the front of Plaintiff's car, and Mills asked Plaintiff if she had been drinking.  Plaintiff stated that she had consumed half a beer.  Plaintiff was asked

---

[1] Plaintiff's mother was watching her one-month old baby.

[2] Because Plaintiff pulled over in an area with no shoulder, Defendants directed Plaintiff to continue driving until both vehicles could safely park on the side of the road.  Plaintiff complied.

to recite the alphabet from "D" to "V" without singing or stopping. She was unable to do so after several attempts by going to "Z" and stopping at "S".

Defendants performed three additional sobriety tests on Plaintiff.[3] Sparacio performed the "horizonal gaze test," where Plaintiff was directed to follow a pen with just her eyes, and Sparacio observed a lack of smooth pursuit in both eyes. Defendants directed Plaintiff to do the "walk and turn test," where Plaintiff was instructed to walk nine steps heel to toe, turn around and walk back nine steps heel to toe. Mills observed that Plaintiff was unable to bring her heel to her toe on several of the steps forward and back.

For the "one leg stand test," Plaintiff was instructed to stand with her heels together and lift either leg six inches off the ground with her hands to her side while counting until instructed to stop. Mills observed that Plaintiff was unable to keep her balance and had to put her foot back on the ground after only eight seconds. When she resumed the test, she lost her balance again.

At that point, Defendants handcuffed Plaintiff and informed

---

[3] All of the sobriety tests were performed in front of Plaintiff's car and not captured on video by the patrol car dash camera. The audio of the tests were recorded, although the parties' voices are obscured sporadically by the sounds of passing tractor-trailers and other vehicles.

her that she was being arrested for driving under the influence. Defendants drove Plaintiff to the Bellmawr state police station, arriving at 4:03 a.m.  After being at the station for 20 minutes, Sparacio conducted two breathalyzer tests.[4]  The results showed a blood alcohol content of .00.  At 5:00 a.m., Defendants called for a Drug Recognition Expert ("DRE") due to their suspicion that Plaintiff was under the influence, but no DRE was available.  At 5:09 a.m., a female police officer from Mantua Township arrived at the station to observe Plaintiff as she provided a urine sample, after which time Plaintiff was

---

[4] The New Jersey Supreme Court has explained the procedure for a breathalyzer test:

> When a person has been arrested, based on probable cause that the person has been driving while intoxicated, he or she is transported to the police station to provide a sample for the Alcotest.  The Alcotest, consisting of a keyboard, an external printer, and the testing device itself, is positioned on a table near where the test subject is seated.

> Operators must wait twenty minutes before collecting a sample to avoid overestimated readings due to residual effects of mouth alcohol.  The software is programmed to prohibit operation of the device before the passage of twenty minutes from the time entered as the time of the arrest.  Moreover, the operator must observe the test subject for the required twenty-minute period of time to ensure that no alcohol has entered the person's mouth while he or she is awaiting the start of the testing sequence. In addition, if the arrestee swallows anything or regurgitates, or if the operator notices chewing gum or tobacco in the person's mouth, the operator is required to begin counting the twenty-minute period anew.

State v. Chun, 943 A.2d 114, 128-29 (N.J. 2008).

permitted to call her mother.[5]  At 6:03 a.m., Plaintiff left the station with her mother.

Plaintiff was issued three tickets for operating a motor vehicle under the influence of liquor or drugs, speeding, and unsafe lane change.  On January 14, 2015, the Bellmawr Municipal Court dismissed all charges against Plaintiff.  As a condition of the dismissal, Plaintiff, who was represented by counsel, signed an "affidavit of probable cause," which provided, in part:

> 2.   I am signing this affidavit to document my agreement to stipulation of probable cause for the traffic stop on May 24, 2014, in exchanged for the dismissal of all of the criminal charges/tickets. . . .
>
> 6.   [My attorney and I] discussed the consequences of stipulating to probable cause as a condition to dismissing all of the tickets.
>
> 7.   My attorney explained that a stipulation to probable cause will have a very serious impact on any future litigation for violation of civil rights and allegations of racial profiling. I understood that I would probably not be able to move forward with a civil rights lawsuit suit.
>
> 8.   I understood that if I do not sign this affidavit, the case would be relisted for trial in approximately two weeks.
>
> 9.   I have considered the above and I am willing to stipulate to probable cause if <u>all</u> of the tickets/charges are dismiss[ed].

(Docket No. 33-3 at 39-40.)

---

[5] The results of Plaintiff's urine sample did not reveal the presence of illegal drugs.  (Docket No. 33-3 at 39.)

Plaintiff has asserted claims against Defendants for violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), and the Fourth Amendment to the U.S. Constitution for false arrest and racial profiling.  Plaintiff claims that Defendants pulled her over simply because they observed through open windows a young female African-American driving a new Cadillac.

Currently pending is Defendants' second motion for summary judgment.  In Defendants' first motion for summary judgment, Defendants argued that Plaintiff's claims were barred by Heck v. Humphrey, 512 U.S. 477, 481-85 (1994) or the doctrine of judicial estoppel because of the "affidavit of probable cause" Plaintiff signed in conjunction with the dismissal of the charges against her.  Defendants also argued that if the Court determined that Plaintiff's claims were not barred, Plaintiff had not presented any evidence, other than her own perception, that she was arrested because she is African-American, rather than being arrested based on probable cause that she was driving impaired, speeding, and veering between lanes.

In considering Defendants' first motion for summary judgment, the Court issued an Order to Show Cause as to why Defendants should not be estopped from relying on the "affidavit of probable cause" signed by Plaintiff in conjunction with the Bellmawr Municipal Court hearing and the dismissal of the

charges against her because it violates public policy as set forth in New Jersey Supreme Court Advisory Committee on Professional Ethics, Opinion 661[6] and Opinion 714[7]. (Docket No. 44.)

Both Defendants and Plaintiff responded, and the Court issued a second Order to Show Cause. (Docket No. 47.) The Court found that Defendant had failed to convince this Court on the present record that their reliance on the Affidavit of Probable Cause did not violate both the spirit and letter of New Jersey Supreme Court Advisory Committee on Professional Ethics, Opinion 661 and Opinion 714. The Court denied without prejudice Defendants' summary judgment motion, and directed the parties to appear for "a hearing so that the Court may determine what action the Court should take regarding Defendants' continued reliance in civil litigation on an affidavit apparently obtained in violation of the Opinions of the New Jersey Supreme Court Advisory Committee on Professional Ethics regarding municipal prosecutors." (Id. at 3.)

In response to the Court's second Order to Show Cause, Defendants filed a letter indicating that they wished to

---

[6] *Municipal Prosecutor Conditioning Plea Bargain Upon Defendant's Execution of Civil Release Form*, 1992 WL 257820, at *1.

[7] *Conditioning Entry of a Plea or Entry into Pretrial Intervention on Defendant's Release from Civil Liability and Hold-Harmless Agreement*, 2008 WL 4790546, at *1.

withdraw their Heck argument relying on the affidavit of

probable cause, and refile their motion for summary judgment

without that argument.[8]  (Docket No. 49.)  The Court granted

_____

[8] Despite the State's withdrawal of its reliance on the affidavit
of probable cause, the Court pauses to reiterate its grave
concern that some six years after the N.J. Supreme Court
Advisory Committee on Professional Ethics reaffirmed its
determination that obtaining such waivers violates Rule of
Professional Conduct 3.4(g), that at least one municipal court
in this state continues to engage in such practices.  The Court
quotes from N.J. Ethics Opinion 714, *Conditioning Entry of a
Plea or Entry into Pretrial Intervention on Defendant's Release
from Civil Liability and Hold-Harmless Agreement*, 2008 WL
4790546:

> Accordingly, in response to the inquiry, the Committee
> confirms that *RPC* 3.4(g) prohibits a prosecutor from
> conditioning entry of a plea or entry into pretrial
> intervention in a criminal, quasi-criminal, or motor
> vehicle matter on the defendant's release from civil
> liability and agreement to hold harmless any person or
> entity such as the police, the prosecutor, or a
> governmental entity. The prohibition applies in all
> situations, including when the defendant's release
> from liability and agreement to hold harmless is
> initially offered by defense counsel.

Id. at 2.  That appears to be precisely what happened here.  The
Court expresses its dismay that the Office of the Attorney
General would seek to rely for its defense on a document
obtained in apparent violation of the Rules of Professional
Conduct.  The Court would have hoped they would have taken the
opposite tack and reassured this Court and the public that such
conduct is not countenanced by those state authorities with at
least some authority, even if only a moral one, over such
practices in the municipal courts.  The State's reliance on the
suspect affidavit hints of a wider systemic problem or, at a
minimum, a failure to provide adequate guidance to municipal
officials on the ethical implications of attempts to obtain such
waivers by municipal court prosecutors.  To the extent such a
practice is widespread in New Jersey municipal courts, it may
well be a worthy subject for further investigation and reform by
the New Jersey state judiciary as it has done in other areas of

Defendants' request and adjourned the hearing.  (Docket No. 50.)

Defendants refiled their motion as indicated, and Plaintiff has opposed Defendants' motion.

## DISCUSSION

### A.   Subject matter jurisdiction

Plaintiff has brought her claims pursuant to 42 U.S.C. § 1983, as well as the New Jersey constitution.  This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

### B.   Standard for summary judgment

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

---

concern regarding municipal court procedures.

9

248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

C.   **Analysis**

The Court finds that Plaintiff has not met her burden to defeat Defendants' motion for judgment in their favor on her claims that she was falsely arrested and subject to racial profiling.[9]

---

[9] Although Defendants eventually withdrew their arguments for judgment in their favor based on the affidavit of probable caused signed by Plaintiff and the Heck and judicial estoppel doctrines, the Court notes that neither of those doctrines are applicable to the circumstances here, with or without the affidavit of probable cause.  In Heck v. Humphrey, the Supreme Court held that a § 1983 claim for damages premised on a civil rights violation is barred if the suit is inconsistent with or would undermine the lawfulness of a state conviction or sentence.  Heck, 512 U.S. at 486.  For the Heck doctrine to apply, a "conviction or sentence" must have been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Heck, 512 U.S. at 486.  Plaintiff was not subjected to either a conviction or a sentence and thus Heck is inapplicable.  Similarly, three requirements must be met before a court may apply judicial estoppel: (1) the party to be estopped must have taken two positions that are irreconcilably inconsistent; (2) the party changed his or her position "in bad faith—i.e., with intent to play fast and loose with the court"; and (3) a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.  Montrose Medical Group Participating Savings Plan v. Bulger, 243 F.3d 773, 779-80 (3d Cir. 2001)(citations omitted).  Here, while Plaintiff's statement in her affidavit that probable cause existed for her arrest is inconsistent with her claims that she was falsely arrested (although a finding of probable cause does not automatically negate a plaintiff's racial profiling claim), Defendants have not demonstrated the other two requirements for judicial estoppel to apply.  The record does not support a claim that Plaintiff's complaint against Defendants was filed with the "intent to play fast and loose with the court" such as to warrant application of judicial estoppel.  Thus, regardless of

For Plaintiff's claims against Defendants acting in their personal capacity, the qualified immunity doctrine governs the analysis.[10]  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  Reichle v. Howards, 566

---

the affidavit of probable cause, Heck and judicial estoppel are inapplicable to Plaintiff's claims.

[10] Plaintiff has brought her false arrest and racial profiling claims pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act.  Section 1983 is not a source of substantive rights, but provides a vehicle for vindicating the violation of other federal rights.  Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

To state a claim for relief under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).  The New Jersey Civil Rights Act, N.J.S.A. 10:6-1 et seq., was modeled after § 1983 and creates a state law cause of action for violation of an individual's federal and state constitutional rights.  Owens v. Feigin, 947 A.2d 653 (N.J. 2008).  The New Jersey Civil Rights Act is interpreted analogously to § 1983. Norman v. Haddon Township, 2017 WL 2812876, at *4 (D.N.J. 2017).

U.S. 658, 664 (2012).  In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct?  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."  Id.  It is the defendant's burden to establish entitlement to qualified immunity.  Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004).

Plaintiff has challenged the lawfulness of Defendants' vehicle stop and her arrest because she contends they lacked any reasonable suspicion that she was violating the traffic laws, they did not have probable cause to arrest her for driving under the influence, and their motives were instead racially biased. Plaintiff refutes that she was speeding, and contends that Defendants lied about her driving 85 mph in a 45 mph zone. Plaintiff argues that this is evidenced by the fact that one Defendant states that Plaintiff was driving 82 mph in a 45 mph zone on the dash cam video and audio recording, but she was charged with driving 85 mph.  Plaintiff refutes that she failed to maintain the proper lanes, and states that she used her turn signals appropriately, which is captured on the video.

13

Plaintiff further relates that she felt that she did well on the field sobriety tests, and did not fail them as Defendants determined.  Plaintiff also contends that she was held at the station for an excessive amount of time, and forced to take a urine test in order to be released.  Plaintiff claims that Defendants, who are Caucasian, acted in the way they did because she is a young African American woman who was driving a nice car.

The evidence in the record does not support Plaintiff's contention that Defendants violated Plaintiff's constitutional rights.

### a.   Validity of the stop

The "lawfulness of the initial traffic stop is properly analyzed under the Fourth Amendment, as a traffic stop is a 'seizure' within the meaning of the Fourth Amendment, and the traffic stop is valid if the officer has a reasonable, articulable suspicion that a violation has occurred." United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show

14

probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

Plaintiff testified that she was not aware of Defendants' patrol car until their lights illuminated, and the dash camera video captured several minutes of Defendants following Plaintiff's car prior to the lights turning on.  The video begins with one Defendant stating that Plaintiff was failing to maintain the lane, and the video captures Plaintiff changing multiple lanes with her turn signal, but at one point straddling two lanes before entering an exit ramp, albeit very briefly. While on the exit ramp with Defendants following behind, one Defendant comments that Plaintiff was driving 82 mph in the 45 mph zone.  Plaintiff testified that she never noticed Defendants driving along side her car so that they could observe her prior to stopping her, and the video does not show any indication who is driving Plaintiff's car.  The dash cam audio does not reveal that Defendants were aware of Plaintiff's identity as a young African American woman, and Plaintiff's license plate was not run until after Plaintiff was stopped.

Based on this record evidence, no reasonable juror could conclude that Defendants lacked a reasonable, articulable suspicion that Plaintiff was violating several traffic laws sufficient to justify stopping her vehicle.  The record evidence also fails to support a claim that Defendants pulled over Plaintiff because of her race.

15

### b.  Validity of the arrest

To prove a claim for false arrest under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause. James v. City of Wilkes-Barre, 700 F.3d 675, 680 (3d Cir. 2012). An officer has probable cause to arrest when "the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000).

After Plaintiff pulled over, Defendants indicated they smelled alcohol from the inside of the car.  While she was out of the vehicle, Defendants responded again that they smelled alcohol on Plaintiff's breath and asked if he had consumed any alcohol that evening, and Plaintiff stated that she only had half a beer and she does not really drink because she has a new baby and was breastfeeding.  Defendants performed the sobriety tests, and the audio recording demonstrates that Plaintiff was not able to successfully perform any of the tests.  Defendants informed Plaintiff that she was being placed under arrest for driving under the influence.

The determination of whether there was probable cause to arrest requires a "common sense approach" based on "the totality

of the circumstances." <u>Sharrar v. Felsing</u>, 128 F.3d 810, 818 (3d Cir. 1997).  "[I]n reviewing probable cause determinations made by law enforcement, the role of the courts is not that of the much-maligned 'Monday morning quarterback' whose critiques are made possible only by the benefits of hindsight.  Rather, federal courts review the record to ensure that the proper procedure for determining probable cause was followed." <u>Dempsey v. Bucknell University</u>, 834 F.3d 457, 469-70 (3d Cir. 2016) (citation omitted).

The Court finds that Plaintiff has not met her burden to cast doubt on the existence of probable cause to arrest Plaintiff for driving under the influence.  The evidence shows that Defendants observed Plaintiff speeding and straddling two lanes for a period of time, Plaintiff admitted to Defendants that she consumed an alcoholic beverage that evening,[11] Defendants detected the odor of alcohol from Plaintiff, and Plaintiff did not successfully complete any of the field sobriety tests.  Even though Plaintiff's blood alcohol level was later determined to be .00 and her urine negative for drugs, the totality of the circumstances facing Defendants at the time of their encounter would compel a reasonable person to believe that Plaintiff was

---

[11] Plaintiff testified in her deposition that her friends drank wine but she did not consume any alcohol that evening.  (Docket No. 40 at 11.)  The audio recording clearly reflects that Plaintiff stated she consumed half a beer.

17

committing the offense of driving under the influence.  See
N.J.S.A. 39:4-50(a) (prohibiting the operation of "a motor
vehicle while under the influence of intoxicating liquor"); State
v. Tanashian, 2017 WL 5076371, at *6 (N.J. Super. Ct. App. Div.
2017) (citing State v. Basil, 202 N.J. 570, 585 (2010) (quoting
Maryland v. Pringle, 540 U.S. 366, 371 (2003)) (explaining that
in assessing probable cause for driving under the influence, a
judge considers the totality of the circumstances, and the facts
are viewed "from the standpoint of an objectively reasonable
police officer"); cf. State v. Targan, 2019 WL 92413, at *5-6
(N.J. Super. Ct. App. Div. Jan. 3, 2019) (explaining that it is
well-established that an officer's subjective observation of a
defendant, such as a defendant's demeanor and physical appearance
– coupled with proofs as to the cause of intoxication – i.e., the
smell of alcohol, an admission of the consumption of alcohol, or
a lay opinion of alcohol intoxication, is a sufficient ground to
sustain a DWI conviction); State v. Arno, 2017 WL 5478354, at *3
(N.J. Super. Ct. App. Div. 2017) (finding that "there was
obviously probable cause to arrest defendant for DWI under the
totality of circumstances" where the defendant operated his car
erratically, smelled of alcohol, had watery eyes, exhibited
boisterous behavior, admitted to drinking, and failed both field
sobriety tests).

### c.   Racial profiling claim

Plaintiff's claim that her stop, arrest, and resulting treatment at the police station was solely based on her race is also unsupported by the record evidence.  Selective enforcement of the law, colloquially referred to as "racial profiling," is a violation of the Equal Protection Clause, since the Clause "'prohibits selective enforcement of the law based on considerations such as race.'"  Nelson v. Karins, 2012 WL 1435634, at *3-4 (D.N.J. 2012) (quoting Whren v. United States, 517 U.S. 806, 813 (1996)).  Even where there is no Fourth Amendment violation, that does not mean that a person was not discriminatorily selected for enforcement of a law, and an equal protection claim requires a wholly separate analysis from a claims under the Fourth Amendment.  Id. (citing Carrasca v. Pomeroy, 313 F.3d 828 (3d Cir. 2002); Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety, 411 F.3d 427, 440-41 (3d Cir. 2005)).  "'To prevail on an equal protection claim in the racial profiling context, [a p]laintiff would have to show that the challenged law enforcement practice had a discriminatory effect and [in addition] was motivated by a discriminatory purpose.'"  Id. (quoting Carrasca, 313 F.3d at 834).

For the first prong, a plaintiff must show that she is a member of a protected class and that she was treated differently from similarly situated individuals in an unprotected class.  Id.

19

(citing Bradley v. U.S., 299 F.3d 197, 206 (3d Cir. 2002)).   For the second prong, a plaintiff must prove facts showing that the defendant acted with a discriminatory purpose to permit the court's reasonable inference that the government-official defendant acted for the purpose of discriminating on account of race.  Id. (citing Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009)).

In this case, Plaintiff contends the following shows that Defendants' interaction with her was motivated solely by discriminatory purpose:  (1) Defendants observed that she is a young African American woman driving a fancy car with the windows open; (2) she was not speeding, and Defendants charged her with driving 85 mph even though they stated in the patrol car that she was driving 82 mph, (3) she did not drive erratically, (4) she did well on the sobriety tests, and (5) she was forced to take two breathalyzer tests and provide a urine sample before she could call her mother.  Plaintiff's own perceptions that her race motivated Defendants' actions are unsupported in the record, and are insufficient to defeat Defendants' summary judgment motion.

There is no evidence that Defendants observed Plaintiff through her windows prior to their pursuit, but even if they had, the audio recording does not reveal that Defendants made any comments about Plaintiff's race during the entire encounter.

20

Further, Plaintiff herself testified that she did not hear
Defendants make any remarks about her race.  Even though
Defendants are recorded as saying that Plaintiff was driving 82
mph while she was driving on the off-ramp, that comment alone,
observing a moment in time, fails to demonstrate that Plaintiff
had not driven 85 mph while under observation by the officers.
Additionally, after Plaintiff stopped and Defendants were
speaking with her through her passenger-side window, one of the
Defendants informed her that she had been driving 85 mph.

Regardless, however, of whether Plaintiff was driving 37
mph or 40 mph over the speed limit, Plaintiff has not provided
any proof, other than her own perception, that she was not
speeding, and that speeding was a pretext for Defendants'
racially motivated actions.  Plaintiff further has not provided
any proof that a person in the same situation but who is not in
a protected class would not have been treated in the same
manner.

Plaintiff has similarly failed to provide any evidence,
other than her own beliefs, that Defendants' assessment of her
driving and sobriety test performance, and the implementation of
two breathalyzer tests and the need for a urine sample, were
different because of her race.  Without any indicia that
Plaintiff's race was a factor in Defendants' actions,
Plaintiff's racial profiling claim fails.  See, e.g., Nelson,

2012 WL 1435634, at *3-4 (dismissing the plaintiff's racial profiling claim that he experienced a feeling of being "racially profiled" because "his purely subjective feeling, expressing nothing bit a bold conclusion, cannot operate as plausible factual allegation"); Mitchell v. Township of Pemberton, 2010 WL 2540466, at *5-6 (D.N.J. 2010) (explaining that "racial profiling" is a legal term of art that results an equal protection violation, and it is not sufficient to prove "racial profiling" by simply stating that the officers stopped the plaintiff based on his race); cf. Brown v. Railroad Group Limited Liability Company, --- F. Supp. 3d ---, 2018 WL 5729906, at *8 (D.N.J. Nov. 2, 2018) (quoting Boykins v. SEPTA, 722 F. App'x 148, 158 (3d Cir. 2018) (citing Lexington Ins. Co. v. W. Pennsylvania Hosp., 423 F.3d 318, 333 (3d Cir. 2005) (quoting Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995)) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

<u>**CONCLUSION**</u>

Even though the stipulation as to the existence of probable cause signed by Plaintiff in the municipal court in exchange for the dismissal of the state court charges against her does not bar her false arrest and racial profiling claims in this Court, Plaintiff has not met her burden to defeat Defendants' motion

22

for summary judgment by showing disputed material facts regarding the constitutionality of Defendants' actions.  In the absence of a viable claim of a violation of the Constitution, Defendants maintain their qualified immunity and are therefore entitled to judgment in their favor.

An appropriate Order will be entered.


Date:  June 25, 2020                 s/ Noel L. Hillman
At Camden, New Jersey       NOEL L. HILLMAN, U.S.D.J.